Michael Kamau **HENDERSON**, Plaintiff,

v.

**CENTER FOR COMMUNITY ALTERNATIVES** (formerly National Center on Institutions and Alternatives/Northeast), and Kathleen O'Boyle, both individually and in her capacity as Deputy director of the Center for Community Alternatives, Defendants.

No. 94 Civ. 6494 (RWS).

United States District Court, S.D. New York.

Jan. 11, 1996.

691

Cohen, Weiss and Simon, New York City
(Nathaniel K. Charny, of counsel), for Plaintiff.

Orrick, Herrington & Sutcliffe, New York
City (Michael Delikat, C. Rochelle Moorehead, of counsel), for Defendants.

*OPINION*

SWEET, District Judge.

In this action brought under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 *et seq.* (1988 & Supp. V 1993); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (1988) & Supp. V 1993) ("Title VII"); 42 U.S.C. § 1983, for violations of First Amendment rights; and the New York Human Rights Law, N.Y. Executive Law § 290 *et seq.* (McKinney 1993) by Plaintiff Michael Kamau Henderson ("Henderson") against Defendants the Center for Community Alternatives ("CCA") and Kathleen O'Boyle ("O'Boyle") (collectively, the "Defendants"), Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that there are no genuine issues of material fact for trial and that Defendants are, therefore, entitled to judgment as a matter of law.

For the reasons discussed herein, the motion will be granted in part and denied in part.

### Prior Proceedings

On December 20, 1993, Henderson filed a timely charge with the New York State Division of Human Rights. That charge was cross-filed with the Equal Employment Opportunity Commission (the "EEOC"). The charge complained of the acts of race discrimination and retaliatory discrimination alleged in this action. On July 14, 1994, Henderson received from the EEOC a notice informing him of his right to sue Defendants in federal court.

Henderson filed his Complaint on September 8, 1994, and Defendants answered on November 15, 1994. On June 1, 1995, Defendants filed their notice of this motion. After supporting and opposition papers had been submitted, oral argument was heard and the matter was deemed fully submitted on September 20, 1995.

### The Complaint

The Complaint is based on six claims. Claim One alleges race discrimination in violation of Title VII. Claim Two alleges discriminatory discharge under Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Claim Three alleges retaliatory discharge in violation of Title VII, 42 U.S.C. § 2000e–3(a). Claim Four alleges retaliatory discharge under Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Claim Five alleges unlawful discharge for the exercise of First Amendment rights under 42 U.S.C. § 1983; Claim Six alleges discriminatory discharge in violation of the New York State Human Rights Law, N.Y.Exec.Law § 296.

### The Parties

Henderson, an African–American man, is a citizen of New York.

CCA, formerly known as the National Center on Institutions and Alternatives/Northeast ("NCIA/Northeast"), is a private, not-for-profit organization which provides direct services to professionals and clients in the criminal and juvenile justice systems and related human service systems, as well as providing training and technical assistance in those fields. CCA maintains offices and programs in both New York City and Syracuse.

Funding for CCA's project comes primarily from public funding received through contracts for CCA services. Among the public entities paying CCA are the New York State Division of Probation and Correctional Alternatives, the New York City Office of the Deputy Mayor for Public Safety, the Onondaga County Department of Social Services, and the Onondaga County Bar Association Assigned Counsel Program. Program support and start-up funding for many CCA programs have been initiated by private foundation grants. In addition, private monies also come from donations and fee-paying clients.

CCA's New York office runs three main projects: the Youth Advocacy Project ("YAP", the "Project" or the "Program"), Crossroads, and the Client Specific Planning Project ("CSP"). These three projects serve distinct offenders but share certain methodologies. Crossroads and YAP are both located within the same office complex, but they are run separately, each maintaining office space physically separate from the other. For the most part, each project maintains its own separate staff. Project directors have responsibility only for their own employees,

and employees are not accountable to the staff of other programs.

YAP serves as an alternative to detention for juvenile offenders, most of whom are charged with serious felony offenses, who have been detained at Spofford Juvenile Detention Center in the Bronx ("Spofford") for at least one month. The program began when the National Center on Institutions and Alternatives ("NCIA") received funding approval for YAP in 1989. Until June 30, 1992, NCIA was the parent agency for YAP. At that time, YAP broke off from NCIA and chartered NCIA/Northeast, ultimately called the Center for Community Alternatives. YAP seeks to prevent recidivism through intensive intervention, which includes case planning, court advocacy, and community support and supervision. Referrals to the program are initiated primarily by defense counsel, courts, and staff members at Spofford. Upon a client's referral, YAP case managers assess the client's needs and develop a plan to meet the needs of the client, the community, and the justice system. If the court accepts the plan and releases the child from detention conditioned upon the child's participation in YAP, a case manager is assigned to have daily contact with the client in his or her community for up to one year following the child's release.

Crossroads is specifically designed for women offenders sixteen years of age and older with histories of substance abuse who have been charged with felonies. The program places special emphasis on working with mothers and pregnant women. If accepted into the program, Crossroads clients must commit to twelve months of day-treatment program involvement, followed by community-based case management. Crossroads staff provide intensive case management services to ensure continued abstinence and success in productive, healthy community living. Crossroads staff also regularly provide client progress reports to courts, the District Attorney, defense attorneys, and other involved agencies, such as the probation department.

CSP, the third of CCA's programs, is the alternative sentencing service of CCA and the foundation of all agency programs. CSP is part of CCA's array of criminal justice programs and is available to criminal defendants in both federal and state courts. The form of intervention varies, tailored specifically to the needs of the client in formulating an alternative to incarceration, including treatment programs, vocational training, and housing services.

CCA provides services primarily to members of minority groups. At the time that Henderson was discharged from his position with YAP, all of the clients of Crossroads were either black or Latino women, and ninety-five percent of YAP clients were either black or Latino.

CCA employs a professional staff that is composed primarily of members of minority groups, many of whom work in key managerial positions. Over fifty-percent of the Crossroads professionals are either black or Latino. Of YAP's professional staff of eleven, all are either black or Latino.

O'Boyle, who is white, is the Deputy Director of CCA in New York. In that capacity, she has administrative responsibility over the New York operations, including both YAP and Crossroads. O'Boyle is also directly responsible for the CSP. During the entire period of Henderson's tenure at CCA, O'Boyle was Henderson's highest-ranking supervisor and reviewed and approved all decisions regarding his employment.

### Relevant Non–Parties

Marsha Weissman ("Weissman"), who is white, is the Executive Director of CCA. She is located in Syracuse but oversees operations in both Syracuse and New York City.

YAP was directed by Christine Pahigian ("Pahigian"), who is white, until her resignation in or around April 1993.

Charmane Wong ("Wong") is a Caribbean-American. Each of her parents had one black parent. Wong succeeded Pahigian as Project Director of YAP in August 1993 and left CCA in mid–1995.

Crossroads is run by Kenneth Bloomfield ("Bloomfield"), its Project Director, who now serves as the acting Project Director for YAP. Bloomfield is white.

## Facts

In deciding a motion for summary judgment, "[a]s a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Burtnieks v. City of New York,* 716 F.2d 982, 983–84 (2d Cir.1983). The facts as presented here are construed accordingly, and they are limited to this motion.

### I. Henderson's Early History at YAP

Henderson was hired by YAP on May 14, 1990, as a Case Manager, by Pahigian with the approval of Weissman and O'Boyle. As one of the first three case managers hired to effectuate the Alternatives to Incarceration contract between the City and State of New York and what was then NCIA, Henderson was involved in establishing the duties and responsibilities of a case manager. Henderson's duties included supervision and management of approximately eight YAP clients. Specifically, his responsibilities included conducting intake and background investigations, developing alternative-to-detention plans to submit to the courts, advocating to the courts for the release of clients from detention into the Program, supporting the children and their families through direct community-based contact and interaction, and regularly submitting progress reports to the courts and other appropriate individuals.

On April 11, 1991, Henderson received his first performance review. He received a grade of "outstanding", the highest available, in eight of the ten categories in which he was rated, one "high" grade, and one "normal" grade. Based upon this performance review, Henderson received a pay raise.

In October 1991, Pahigian promoted Henderson to the position of Senior Case Manager, with an accompanying pay raise, and that promotion was approved by O'Boyle and Weissman. In addition to his case management duties, Henderson became responsible for assisting in the supervision of three case managers, including providing them with guidance in their casework with clients.

On October 15, 1992, Henderson received another performance review. He received exclusively "outstanding" grades and received high praise. Indeed, throughout his tenure as Case Manager and Senior Case Manager, Defendants aver that Henderson was considered by Pahigian, O'Boyle, and Weissman to be an excellent and valued employee.

In April 1993, Pahigian resigned, and, as part of YAP's restructuring, Henderson was promoted at the behest of Pahigian and with the efforts of Weissman and O'Boyle on July 1, 1993, to the newly created position of Director of Case Management Services ("DCMS"). As the first person to fill this new position, Henderson was involved in establishing the duties and responsibilities of the DCMS. His duties included direct supervisory responsibility and training of all case management staff, consisting of one Senior Case Manager and five case managers. Henderson had exclusive authority over case management decisions and bore responsibility for maintenance of all client files and records. Because of these additional supervisory responsibilities, Henderson carried a reduced caseload of four clients during his tenure as DCMS. Among his accomplishments during his tenure was to increase significantly the number of referrals to YAP, a goal in light of the fact that the Project had failed to meet its contractual goals during the previous fiscal year.

Just before Henderson assumed the position of DCMS, following Pahigian's resignation in April, YAP operated until August 20, 1993, without a Project Director until Wong filled the vacancy. During this time, Henderson was the highest-ranking case management employee at YAP and had extensive latitude and autonomy.

## II. *The Automobile Incident*

Defendants allege that the relationship between Wong and Henderson began on poor footing, and that almost instantly upon taking over YAP, Wong experienced resistance from Henderson in accepting her supervision and authority. Their first exchange, besides mere pleasantries, consisted of an encounter in which Henderson objected to and challenged Wong's enforcement of a YAP policy on employee use of automobiles leased by the Project. Henderson asserts that the nature of this interaction was professional, not personally antagonistic.

The details of the interaction are as follows. Case managers were allowed to use leased cars available to YAP as needed, provided use had been approved by either the Project Director or the Assistant Project Director. Because there was no Project Director at the time a memorandum was issued regarding this policy, Henderson, as DCMS, was allowed to approve the case managers' use of the cars. Several days after Wong began as Project Director at YAP, she issued a memorandum reiterating that only she or the Assistant Project Director could approve case managers' use of cars. Henderson's access to the cars remained unchanged, but he did confront Wong after learning of her memorandum, dismayed at the fact that she had made the change without first consulting with him. Defendants assert that this confrontation began a strained relationship between Henderson and Wong, marked by Henderson's refusal to adapt to Wong's different approach to management of YAP and to her tempering of his previous authority and control. Henderson states that the situation was relatively cordial once the misunderstanding had been worked out, and that there were no lingering bad feelings between him and Wong.

## III. *The Crossroads Incident*

On October 15, 1993, Henderson overheard a Crossroads client, Simone, an African–American woman who was engaged in cleaning a bathroom at the YAP offices on the CCA premises, complaining that she had been compelled by the Crossroad program to do that work. Crossroads had only recently required its clients to clean the YAP bathrooms, and Simone informed Henderson of that fact. Also recently, Darrel, an African–American man, had been replaced as CCA's maintenance worker by John Clohessy ("Clohessy"), a white man. Henderson was dismayed upon learning of Crossroads' new policy. He asserts that there were two sources of his dismay. First, Henderson states, he believed that the practice of compelling Crossroads clients to clean CCA bathrooms was discriminatory and akin to slavery, because the Crossroads clients were exclusively black and Latino, because the new cleaning policy had been implemented at the same time that Clohessy had replaced Darrel, and because Clohessy had been hired to supervise the Crossroads clients, though Darrel had cleaned the CCA bathrooms without assistance. Second, Henderson states, he was bothered by the appearances presented by the Crossroads policy, believing them antithetical to the philosophy of CCA. Henderson asked Simone to stop cleaning the YAP bathrooms and advised her that he would speak to someone about the new requirement.

When Bloomfield learned that day of Henderson's actions, he asked O'Boyle to call a meeting among the three of them. Bloomfield argued to O'Boyle that it was improper and potentially damaging from a treatment perspective for Henderson to undermine the authority of the Crossroads treatment team by giving any instructions directly to Crossroads clients. Bloomfield told O'Boyle that Henderson should have raised any concerns or objections with Bloomfield or another Crossroad employee.

O'Boyle asked Henderson to come to her office, and Bloomfield reiterated his objections to Henderson's behavior. Henderson expressed his objection to the new cleaning policy as discriminatory, degrading to the clients, and contrary to the goals of CCA. Henderson further stated that he believed an improper appearance was presented by having the Crossroads clients cleaning, because of the stereotypes associated with that work, and in light of the fact that all of the Crossroads clients were all black or Latino. Bloomfield emphasized that all Crossroads

clients were required to undertake various responsibilities in order to instill a sense of ownership of the community as part of the Crossroads treatment program, and that this was a widespread therapeutic philosophy in other, similar treatment communities. Bloomfield stressed that the client responsibilities program had been instituted by Donna Harris, the Crossroads Director of Treatment, who is black.

Henderson alleges that at the meeting, Bloomfield suggested that Henderson himself was a racist because Henderson had objected to the policy only because all of the Crossroads clients were members of minority groups and that Henderson would not have reacted to their cleaning the YAP bathrooms had they been white. Henderson also alleges that during the meeting, O'Boyle defended the policy in part because she claimed the Crossroads clients enjoyed cleaning.

After the meeting, Crossroads no longer required its clients to clean the bathrooms on the YAP side of the CCA facility. Henderson states that this change in policy constituted a compromise to which O'Boyle and Bloomfield reluctantly agreed. Defendants state that they believed that Henderson had raised a valid point regarding the possibility of misinterpretation of the client responsibilities by those unfamiliar with the concept of rehabilitative treatment, and they thus decided to discontinue cleaning on the YAP side of the CCA facility, while continuing it on the Crossroads side.

Subsequent to this meeting, Bloomfield and O'Boyle never discussed the issue again with Henderson. Defendants assert that neither Bloomfield nor O'Boyle discussed the incident with Wong prior to Henderson's discharge, believing the situation to be resolved. Henderson asserts that the incident became the focus of substantial discussion among Bloomfield, O'Boyle, Weissman, and the Crossroads staff over the next several weeks, and that his actions were cast in a negative light in the course of those discussions.

## IV. *The File Review*

Because YAP contracts with the City of New York, the Project is subject to periodic site visits from City contractors monitoring YAP's compliance with the terms of the contract. The City monitors were scheduled to conduct a site visit of YAP on October 26, 1993. These site visits had occurred regularly during Pahigian's tenure as Project Director, but the October 26, 1993, visit was to be the first following Wong's employment as Project Director. Typically during these site visits, monitors conducted an audit of the case management files to assure that the clients were being adequately supervised upon release from detention in accordance with the contract terms.

Defendants state that as the date for the monitors' visit neared, Henderson had not conducted a preliminary file inspection in preparation for the visit, and so Wong, growing anxious, conducted the inspection herself, with the assistance of O'Boyle. As they began to review the client files for each of the case managers, Wong and O'Boyle discovered what they perceived to be serious problems in the maintenance of the files of Henderson and the case managers he supervised. Defendants allege that the client files were poorly maintained, with missing or incomplete reports and forms, that many case managers were not current in recording their client contact, and that some of the case managers were not having face-to-face contact with the frequency required under the contract and promised to the courts.

Henderson asserts that he had recently checked the case managers' files and that he had found them to be sufficiently maintained. He states that he had been engaged in the file review in preparation for the monitors' visit and that he was actively monitoring the Case Managers' progress in updating their files. Henderson asserts further that he had spoken with case managers regarding the few problem files, enlisting the help of Nancy Bradley ("Bradley"), then Senior Case Manager, in conducting his file review and follow-up.

Of particular concern to Wong and O'Boyle, state Defendants, was that Henderson and Bradley, the two case managers in supervisory positions, had the worst files. The only client files of Henderson found by O'Boyle and Wong were older

cases, and, Defendants assert, those files were poorly maintained. Although Wong and O'Boyle did not realize it at the time, Henderson's current case files were at YAP's office at Spofford, where Henderson had been reassigned in an effort to enhance CCA's presence at the facility and, thereby, to increase the number of referrals. As a result, O'Boyle and Wong did not review Henderson's open files. Given the absence of the files at Spofford and in light of what Defendants allege to have been the poor state of Henderson's old files at YAP's main offices, Wong was initially unable to discern whether Henderson's files were of current or closed cases because, although appearing somewhat old, some did not have notes indicating that they were closed and did not have discharge forms indicating the final disposition of the case. Therefore, in some instances, Wong could not tell if Henderson had gone for a long time without contacting or recording contact with a client or had closed a case without properly documenting it as such.

In light of her review of the files, Wong felt overwhelmed by what she perceived to be the level of deficiency of the clients' files and the amount of work that she believed necessary to bring the files up to par. She thus cancelled the visit of the City monitors, feeling that it was an insurmountable task to get the files in proper order within the few days remaining before the scheduled visit.

Following the folder review, Wong met with each case manager to discuss the quality of the maintenance of that case manager's files. At her meeting with Henderson, at which O'Boyle was also present, Wong informed Henderson that he was to be relieved temporarily of his supervisory duties. In the interim, all case managers were to report directly to Wong. Defendants state that because Wong perceived Henderson's and Bradley's files to be particularly deficient, Wong, with the approval of O'Boyle and Weissman, temporarily suspended their supervisory responsibilities merely to give them time to catch up on their case management responsibilities. Defendants assert that this temporary measure was not disciplinary but an opportunity for Henderson

and Bradley to get organized and refocused in order to be in a position to resume their supervisory roles later. During the meeting, Wong expressed her disappointment with Henderson's performance of his duties, emphasizing the importance of his leading by example and his responsibility for ensuring that all of the case managers' files were properly maintained.

By all accounts, Henderson was severely dismayed by Wong's actions. After the meeting, Henderson contacted Weissman, the CCA Executive Director, to discuss what he perceived to be unfair and pretextual discriminatory treatment. Weissman told Henderson that she had heard negative comments about Henderson and about the October 15, 1993 meeting following the Crossroads incident. Weissman, Henderson states, told him that he should learn how to present himself better. Henderson learned at that time that many of the management-level employees were discussing his objections to the Crossroads cleaning policy.

Defendants assert that following the file review, the subsequent meeting, and the measures taken as a result thereof, Henderson entered into a pattern of insubordination and outright defiance which made relations irretrievably poor, with the prospect of a professional working relationship impossible. They point also to substantive errors of Henderson that justified his discharge. Henderson counters with what he asserts are reasonable explanations for his alleged failures.

## V. *The Diaz Incident*

Johnny Diaz ("Diaz") was a YAP client supervised by James Hudson ("Hudson"), one of the YAP case managers. During his four-month tenure in the Program, Diaz had consistently refused to comply with the terms and conditions of his release by failing to maintain his appointments with Hudson, to attend school, and to adhere to his curfew. After discussing the matter with Hudson, Defendants state, Wong determined that Diaz's participation in the program should be terminated and his case closed. Defendants state that Henderson then contacted Hudson, seeking to have him transfer Diaz's file to

Henderson. Upon learning of this action from Hudson, Defendants state, Wong reiterated that the decision already had been made to terminate the client from the program, that a letter would be sent to the judge explaining this fact, and that Henderson was to take no further action on the case.

Henderson asserts that he never received instructions to cease activity on behalf of Diaz. Rather, he asserts, he had asked to have the Diaz case reassigned to him to give Diaz one more chance with YAP. He asserts that Wong agreed with this approach.

Immediately following the file review meeting with Wong, Henderson went for several days without appearing at YAP headquarters, without having told Wong his intention to take time off. He did convey through the receptionist his intent to take the week off for personal reasons. In addition, Henderson conveyed through the receptionist his intent to go to court to appear on behalf of Diaz. On learning of this fact, Wong sent a memorandum on October 28, 1993, to Henderson directing him immediately to stop all work on behalf of Diaz. Henderson asserts that at the time the memorandum was written, he had already, after working with Diaz for one week, determined that the case should be terminated on October 22, 1995.

## VI. *The Bryant Incident*

YAP receives most of its referrals from Spofford staff and from various judges. After receiving a referral, case managers are required to conduct an investigation to determine whether to accept the child into the Program and to request intervention from the court. Whether or not a child is accepted into the program, Defendants assert, YAP policy requires that a referral form be completed for the Program's records, indicating, among other things, the source of the referral and whether the case was accepted or rejected by the case manager. In addition, Defendants allege, case managers were supposed to review referrals with Wong before proceeding with a case, particularly rejected referrals, so that she could monitor what was occurring in the Program and could deter-

mine whether case managers have a sound basis for rejecting youths.

Defendants assert that Henderson failed to follow these procedures in the case of his client Luther Bryant ("Bryant"). Henderson, they assert, independently accepted the referral from the referring judge, conducted the investigation, and rejected the case, taking all of these actions without discussing the referral or the rejection with Wong and without completing the proper papers to indicate that this activity had been taken with respect to the prospective client. The fact that there was no record of anyone at YAP's coming into contact with Bryant, state Defendants, created confusion at YAP, as several case managers were under the impression that YAP had accepted Bryant into the program.

Henderson states that his actions were in accordance with YAP's operating procedure, since his responsibilities as DCMS established that he would handle all issues concerning case management, and that he thus was not required to seek approval of those actions from O'Boyle or Wong.

On October 28, 1993, O'Boyle asked Henderson to come to her office to meet with her and Wong. At that meeting, O'Boyle and Wong told Henderson that they were dismayed at his actions regarding Diaz and Bryant. Henderson explained the results of his investigation of Bryant and Henderson's rationale for rejecting Bryant from the program. Wong noted that the decision was not the issue; rather, she said, she was dismayed by Henderson's autonomous behavior and disregard for her and for established procedures. She argued that he had failed in his responsibilities to the court and the funders, including documentation and reporting.

## VII. *The Chin Incident*

On October 29, 1995, the day after the meeting regarding Diaz and Bryant and two days before he was to leave for a vacation for the month of November, Henderson met with Wong to turn over two of his case folders. Other staff had been assigned to handle management of Henderson's cases in his absence, and they required the folders to have contact information and to determine if they needed

to appear for court dates or other appointments with respect to the client. The two folders Henderson relinquished were in proper order and adequately maintained. Henderson did not relinquish the folder for his third and only other active case, that of Jet Chin ("Chin"). Henderson states that he retained the file because he wished to handle certain matters during his vacation. Henderson states that he told Wong of this decision and also that he would be keeping the file with him. Defendants assert that Henderson had not completed all of his files, one of which was that of Chin.

Because Henderson had retained Chin's file, YAP staff were unable to communicate with Chin or his family to discuss his status or to schedule visits. Consequently, several weeks passed in November during which YAP effectively lost contact with Chin. After some time, Bradley obtained Chin's telephone number at Wong's behest and scheduled a November 23, 1993, meeting with Chin and his family in order to determine progress in the Project and in school.

The November 23 meeting was aborted, however, because Chin's mother, through an interpreter, informed Bradley, O'Boyle, and Wong that Henderson had contacted her family the previous evening and had expressly instructed them not to discuss her son's case with anyone at CCA besides himself, particularly cautioning the family against talking with Wong. Chin's mother insisted, over O'Boyle's protestations, that she would adhere to Henderson's instructions.

Henderson denies that he gave the Chins such an instruction. Instead, he states, he received a telephone call from the Chins while he was on vacation, because they were confused and concerned about a meeting called at YAP's main office. Henderson states that because he knew nothing about the meeting, he suggested to the Chins that if they wanted him at the meeting, they should request a postponement until after Henderson's vacation.

## VIII. *The Haneiph Incident*

YAP policy is never to accept a client into the program without personally interviewing the individual. Hecliff Haneiph ("Haneiph") was a YAP client whose case was managed by Henderson.

Defendants contend that during Henderson's November vacation, Wong learned that Henderson had accepted Haneiph into the Program without an interview. Henderson states that he encountered Haneiph once at Spofford during an orientation, where they had no individual contact, and then, subsequent to having told Haneiph's mother that Haneiph had been accepted into YAP, encountered Haneiph again at Spofford, where they spoke briefly one-to-one.

At the same time, Defendants assert, Wong learned that Henderson had advocated before a court for Haneiph's release from Spofford under the false pretense that Henderson had conducted a complete investigation, purporting to have interviewed Haneiph and Haneiph's mother and attorney. On investigating the matter, Wong believed that she had determined that Henderson had never interviewed Haneiph or his attorney, had never provided Haneiph with a copy of the release plan submitted to the court, as required by YAP, and had had only cursory communication with Haneiph's mother. This misrepresentation constituted, Defendants assert, a serious breach of YAP policy, since Henderson had stated that Haneiph was suitable for release on his own recognizance without ever meeting with him. They assert that by omitting these interviews and contact and by lying to the Court, Henderson jeopardized the integrity and viability of the Program.

Henderson asserts that he had interviewed Haneiph before submitting the letter to the Court. He asserts that Wong's and O'Boyle's reliance on Haneiph's statement is misplaced, given that Haneiph was a convicted juvenile felon with reasons to lie in order to be released from detention at Spofford.

## IX. *The Termination*

One day before he was due to return from his vacation, O'Boyle asked Henderson to come to her office. O'Boyle and Wong confronted Henderson about the Chin and Haneiph incidents. When confronted, Defendants assert, Henderson first insisted that he

had interviewed Haneiph in July, although he had no recollection of any specifics of the interview. When Wong pointed out that Haneiph had not been arrested until September, assert Defendants, Henderson admitted that he had not interviewed Haneiph and had not conducted a full background investigation.

Defendants state that in light of the Haneiph and Chin incidents, of the conversation about the Haneiph incident, and, more generally, of Henderson's antagonistic relationship with Wong, Wong terminated Henderson's employment, believing that his resistance toward her had reached a level at which she could no longer work with him. Henderson states that he was given three reasons for the discharge: the Haneiph incident, the Chin incident, and Henderson's failure to follow supervision.

After Henderson's discharge, the job of DCMS was eliminated. His duties were assumed by Bradley, who is African–American, and Lopez, who is Latino.

### Discussion

#### I. *Legal Standards*

##### A. *Discrimination*

Title VII states that "[i]t shall be an unlawful employment practice for an employer to ... discharge any individual ... because of such individual's race, color, ... or national origin," 42 U.S.C. § 2000e–2, or "to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3.

42 U.S.C. § 1981(a) reads:

All persons within the jurisdiction of the United States shall have the same right in every States and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens; and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

42 U.S.C. § 1983 reads:

Every person who, under color of any statute, ordinance, regulation, custom, or us-

age, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen or the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

■ Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff in a discrimination case bears the initial burden of establishing a prima facie case of discrimination. *Id.* at 802, 93 S.Ct. at 1824. The burden of establishing a prima facie case is not onerous. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Sweeney v. Research Found. of State Univ.,* 711 F.2d 1179, 1184 (2d Cir.1983).

■ In cases involving retaliation, to make out a prima facie case an employee must show that (1) he engaged in protected activity; (2) his employer was aware of that activity; (3) he suffered adverse employment decisions; and (4) a causal connection exists between the protected activity and the adverse employment action. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992); *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991).

■ In cases involving disparate treatment on account of race, to make out a prima facie case an employee must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was discharged; and (4) his discharge occurred in circumstances giving rise to an inference of racial discrimination. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir. 1989).

■ If the plaintiff carries the burden of making out a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant produces such evidence, the burden returns to the plaintiff, who must demon-

strate that the articulated reason is pretextual. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

## B. Summary Judgment

■ The instant motion is brought pursuant to Rule 56. The motion for summary judgment is "an integral part" of the Federal Rules of Civil Procedure and facilitates the overall purpose of the Rules as stated in Rule 1: namely, "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). A motion for summary judgment may be granted only when there is no genuine issue of material fact remaining for trial and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991). If, when "[v]iewing the evidence produced in the light most favorable to the nonmovant ... a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991).

■ Because questions of discriminatory intent are ordinarily impossible to resolve in advance of trial, summary judgment has been held to be generally inappropriate in employment discrimination cases, *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2 Cir.1991), and should be used only cautiously in such cases. *Samuel v. Merrill Lynch Pierce Fenner & Smith,* 771 F.Supp. 47, 50 (S.D.N.Y.1991). As our Court of Appeals recently explained, "the trial court's task at the summary judgment stage of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219 (2d Cir.1994).

This standard is applied to the instant motion.

## II. The Retaliation Claims Will Not Be Dismissed

■ Claims Three and Four allege that Henderson was dismissed in retaliation for his intervention into and objection to the Crossroads policy of having its clients clean YAP bathrooms. Because genuine issues of material fact exist with regard to those claims, they will not be dismissed.

■ As noted above, Henderson is confronted here with the minimal burden of presenting a prima facie case of retaliation. To do so on a motion for summary judgment, he must first demonstrate that there is a genuine issue of material fact that he engaged in a protected activity. "[T]o establish participation in a protected activity, a plaintiff is required to show not an actual violation of [Title VII], but only that he was acting under a 'good faith, reasonable belief' that such a violation existed." *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1569 (2d Cir.1989) (*citing Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir.1988)). Several facts known to or believed by Henderson at the time he became aware of the cleaning policy could lead a reasonable finder of fact to infer that Henderson held a good faith, reasonable belief that the policy was discriminatory. First, all Crossroads clients were black or Latino. Second, until just before Henderson learned of the policy, the YAP bathrooms had been cleaned by Darrel. Third, Clohessy had been hired only to supervise those who cleaned bathrooms not to do cleaning himself. Fourth, Crossroads had implemented the cleaning policy which required the exclusively minority women to clean the bathrooms apparently as part of the transition from Darrel to Clohessy. Based on these facts, regardless of whether the policy actually discriminated on account of race, a reasonable finder of fact could conclude that Henderson deemed it discriminatory.

■ It is true that evidence exists to contradict Henderson's allegation that his objections were motivated by a belief that CCA was discriminating. Henderson's Complaint to the New York State Division of Human Rights and testimony by Bloomfield and O'Boyle regarding the meeting following the Crossroads incident suggest that Henderson's protest was based on race-neutral grounds: that the Crossroads policy ran counter to CCA's general philosophy. None-

theless, Henderson's subsequent deposition testimony that his protest was motivated at least in part by perceptions of discrimination presents an issue to be tried, given the racial makeup of the clientele, the recent change in personnel, and Henderson's account of the meeting among him, O'Boyle, and Bloomfield. To the extent that Henderson's various testimony presents inconsistencies, a reasonable finder of fact could determine that Henderson's objections were based both on his belief that CCA was discriminating and on his other, non-legal objections to the policy. In any case, to the extent that such discrepancies exist in Henderson's testimony, they go to the issue of credibility and do not eliminate the disputed nature of the material facts. *See Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 576 (2d Cir.1982).

The second and third elements of a prima facie case are not in dispute. CCA and O'Boyle knew that the Crossroads policy existed, and the termination of Henderson's employment surely constituted an employment decision adverse to him.

The final element of a prima facie case of retaliatory discharge here requires Henderson to demonstrate that a triable issue is presented as to whether a causal connection exists between the protected activity and the adverse employment action. *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 64 (2d Cir.1992); *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991). A trier of fact could, on the evidence proffered by Henderson, find that Henderson was discharged as a result of his actions on October 15 with regard to the Crossroads policy.

■ The causation element of a prima facie case can be demonstrated in several ways. One is temporal proximity. *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.1987), *cert. denied,* 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1988); *Davis v. State Univ. of N.Y.,* 802 F.2d 638, 642 (2d Cir.1986); *Grant v. Bethlehem Steel Corp.,* 622 F.2d at 43, 45 (2d Cir.1980). Here, merely a month-and-a-half elapsed between the Crossroads incident and the termination of Henderson's employment, in the context of a tenure of over three years. The brevity of the elapsed time could lead a reasonable finder of fact to infer a causal connection.

Another means of demonstrating causation is direct evidence of retaliatory animus. *DeCintio,* 821 F.2d at 115. A genuine issue of material fact is presented with regard to this element, given the evidence that the matter may have been discussed in a negative light extensively among CCA personnel senior to Henderson and given Weissman's suggestion to Henderson to learn how to present himself better after she had heard about his objection to the Crossroads policy.

■ Henderson having made out, for the purposes of this motion, a prima facie case, and assuming for the purposes of this motion that Defendants can articulate a legitimate, nondiscriminatory reason for Henderson's discharge, *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, summary judgment can be granted only if the evidence presents no genuine issue of material fact that the articulated reason is pretextual. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. In opposing the motion, Henderson need not actually prove pretext; rather, he need merely accomplish one of two things. He may produce evidence from which a reasonable finder of fact could directly infer that the discriminatory reason more likely motivated the employer than the articulated reason; in the alternative, he may show that the employer's proffered explanation is unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *see Sorlucco v. New York City Police Dep't,* 888 F.2d 4, 7 (2d Cir.1989).

As our Court of Appeals has noted, "While some assessing of the evidence is necessary in order to determine rationally what inferences are reasonable and therefore permissible, it is evident that the question of what weight should be assigned to the competing permissible inferences remains within the province of the fact-finder at trial." *Belfiore v. New York Times Co.,* 826 F.2d 177, 180 (2d Cir.1987), *cert. denied,* 484 U.S. 1067, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988) (*quoting Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252–53 (2d Cir.1987); *Wakefield v. Northern Telecom, Inc.,* 813 F.2d 535, 540–41 (2d Cir. 1987). Ample evidence has been produced

by Defendants to convince a finder of fact that CCA had a legitimate, nondiscriminatory reason for Henderson's discharge. Nonetheless, Henderson has presented genuine issues of material fact with regard to the possibility that these articulated reasons were merely a pretext for retaliatory discharge.

The two explicit reasons given at the time of Henderson's discharge will be addressed first. Defendants stated at the meeting at which Henderson's employment was terminated that they were dismissing him because of his insubordination in the Chin incident. They assert that Henderson's failure to relinquish the Chin folder before his vacation, combined with his instruction to Chin's family not to permit Chin to meet with other YAP employees, constituted irresponsibility and insubordination and undermined YAP's integrity and effectiveness. On Defendants' facts alone, there could be little question that Henderson's acts warranted discipline, and perhaps termination.

However, resolving all ambiguities in favor of Henderson, as is required on a motion for summary judgment, *Brady*, 863 F.2d at 210, a trier of fact could deem Henderson's acts to be reasonable, not meriting discharge, and, in the context of the prima facie evidence offered above, presenting a genuine issue of fact as to the possibility of a pretextual termination. Henderson's deposition indicates that he had developed a close relationship with Chin as a result of their work together and that prior to leaving for vacation, Henderson told Wong and Chin that Henderson would keep the Chin file with him during his vacation, maintain contact with Chin during that time, and update the file throughout. Henderson's deposition asserts that during the first three weeks of November, he did so. Henderson has testified that it was Chin, not Henderson, who initiated contact, that Chin's family were confused and concerned about the YAP meeting, that they were eager to meet with YAP only if Henderson was present, and that his response was appropriate: that if they had these concerns, they should seek to reschedule the meeting for a time when Henderson was available.

On Henderson's facts, a trier could deem his actions reasonable and insufficient to warrant his discharge, given the close relationship, the understandable hesitance of Chin and his family to deal with anyone other than Henderson, and the mixed signals the family was receiving. If Henderson, as he has testified, did not advise Chin or his family to refuse to speak with anyone at YAP or single out Wong as untrustworthy, Defendants' articulated reason fails to stand up to Henderson's assertions of pretext.

The second explicit reason for Henderson's discharge at the time his employment was terminated was his mishandling of the Haneiph case. Here, again, the parties' versions of the facts are in conflict. Construing all ambiguities in Henderson's favor, a trier of fact could find that Henderson did not violate YAP policy and, therefore, in combination with the reaction to the Crossroads incident, that the reasons for his firing were pretextual.

Defendants assert that Henderson seriously jeopardized YAP's survival by failing to interview Haneiph before his admission to the program and by knowingly submitting a false report to the court regarding that and other interviews, and that his actions merited his discharge. They point particularly to Haneiph's own testimony that Henderson did not meet with him prior to his admission into the program.

Henderson's testimony, however, controverts Defendants' evidence sufficiently to raise questions warranting trial. Although the circumstances of his initial encounter with Haneiph are left unclear by Henderson's deposition, he has raised sufficient doubts about Haneiph's credibility and Wong's and O'Boyle's reliance on Haneiph's assertions to present genuine questions as to the legitimacy of the reason for Henderson's discharge.

As to the falsification of the court report, the affidavit of Haneiph's attorney, Mr. Albert, suggests that Henderson did speak with the attorney. Henderson's testimony suggests that the attorney inquired about YAP's accepting Haneiph as a client, that Henderson advised Albert that Haneiph

would be accepted only after an investigation, that Henderson investigated the case, and that he then spoke with Haneiph's mother.

The Chin and Haneiph incidents were the only specific events singled out at the time of Henderson's discharge, but Defendants argue that Henderson's other acts of incompetence, irresponsibility, and antagonism towards Wong present a pattern that justified his dismissal. Henderson has, however, presented evidence adequate to raise genuine issues of material fact as to these articulated reasons, and a reasonable finder of fact could deem them to have been merely pretextual.

Another reason for the termination of Henderson's employment offered by Defendants was his failure to maintain his own case files and properly to ensure that the files of those he supervised were in order. Henderson has presented sufficient evidence, however, to lead a trier of fact to determine that he was adequately performing his duties in this regard. With regard to his own client files, Henderson notes that Wong and O'Boyle reviewed only his closed files, since files for his active cases were at YAP's Spofford office. With regard to the state of the files of those he supervised, Henderson has presented several memoranda from Wong to those employees stating that the overall state of their files was good or excellent, even if deficient in some regards. Further, Henderson has testified that, in contrast to Defendants' assertions, he did conduct a review of the files of the case managers in preparation for the expected site visit by the monitors. Genuine issues of material fact thus exist as to the adequacy of Henderson's file maintenance and supervision.

As another reason for Henderson's termination, contributing to his pattern of insubordination and irresponsibility, Defendants point to the Bryant incident. Defendants present substantial evidence that could lead a finder of fact to determine that Henderson mishandled the Bryant incident. Nonetheless, Henderson presents evidence with regard to that incident sufficient to create a genuine issue of material fact. He testifies that as DCMS, he had expressly been delegated exclusive authority over case management decisions, including referrals and rejec-

tions. He thus had no obligation, he states in his deposition, to report or to discuss referrals and rejections with his supervisors. His failure to create a formal case file, he has testified, does not represent a failure to follow YAP policy. He states that on receiving a call from the judge presiding over the Bryant case asking if Bryant was appropriate for the program, he investigated the matter, taking notes throughout, determined that Bryant was not appropriate for the program, and advised the judge of that fact. He states that the standard operating procedure at YAP was not to create a file when a case was not accepted into the YAP program. Construing all contradictions among the parties' facts in Henderson's favor, a reasonable finder of fact could determine that his handling of the Bryant incident did not warrant dismissal.

The Diaz incident provides another example, according to Defendants, of Henderson's insubordination. They argue that although Wong told Henderson that she wanted the case closed, Henderson continued to work on the case until Wong issued a written directive ordering him to stop working on the case and to stop contacting the judge overseeing the case. On Defendants' facts, Henderson's behavior would certainly constitute a legitimate reason for dismissal.

Henderson's version of the facts is quite different, though. He states that when Hudson began to have difficulty with Diaz, approximately four months into Diaz's release, it was suggested that the Diaz case be closed. Wong, Henderson has testified, advised Diaz's probation officer that she would meet with Hudson and resolve the matter by October 15. On that same day, Wong and Hudson spoke about the Diaz case, and Wong determined that the case should be closed. However, says Henderson, when Wong asked his opinion, Henderson asked for an opportunity to work with Diaz before closing the case. Wong's and Henderson's file notes from this meeting can be read to support Henderson's testimony. As a result, says Henderson, he and Hudson continued working on the case for approximately one week. After this last chance, according to Henderson's deposition, Henderson conclud-

ed that Diaz was too difficult a youth for the YAP program and terminated his participation in the program.

Henderson's version of the facts could be read to be consistent with the practices and procedures of YAP, thus not to constitute insubordination, and therefore to present only a pretext for retaliatory discharge. A trier of fact crediting Henderson's evidence, rather than Defendants', could conclude that the Diaz incident failed to constitute a valid reason for the termination of Henderson's employment.

It is against these reasons—those articulated by Defendants as the legitimate rationale for Henderson's discharge—that the alleged act of retaliation must be measured to determine if it is possible to conclude these reasons were pretextual. On the evidence adduced by Henderson, a trier of fact could deem the Crossroads incident to constitute the actual motivation for the discharge. O'Boyle has testified that she spoke with Weissman, Bloomfield, and Clohessy regarding the Crossroads Complaint. Bloomfield spoke with Weissman, O'Boyle, and the Crossroads treatment team, and Bloomfield was kept informed of the disciplinary actions taken against Henderson, according to his own testimony. Wong was also involved, according to her testimony, in the ongoing office dialogue regarding Henderson's Crossroad Complaint, speaking with Weissman, Bloomfield, Bradley, and Henderson. Just after the meeting, Weissman advised Henderson that she had heard negative reports of his behavior. Soon after the incident, Henderson's work was subjected to serious scrutiny. Although Defendants offer evidence strongly suggesting valid reasons for these acts, and although they argue that the events cited by Henderson were so contained and so minor that they do not indicate any motive to retaliate, the two versions of events are in sufficient conflict to allow a trier to conclude that the reasons proffered for Henderson's discharge served as a pretext to retaliate for his dissent.

Defendants object with regard to both the retaliatory discharge and the disparate treatment claims that Wong, not O'Boyle made personnel decisions. O'Boyle's participation in the termination decision, they argue, was limited to her approval of Wong's decision, based upon Wong's recommendation and recitation of the facts. In essence, they assert that O'Boyle rubber-stamped the discharge. Further, they note, during a recent telephone conversation, Henderson admitted to Bradley that he did not think that Wong had been "out to get him" at YAP. Because Wong, not O'Boyle decided to discharge Henderson, Defendants argue, no retaliatory or discriminatory animus led to Henderson's firing.

Defendants properly assert with regard to this argument that determining who was the decision-maker is a question of law, not fact. However, preliminary questions of material fact underlie that question of law: particularly the extent to which O'Boyle actually consulted with Wong before Henderson's discharge. Henderson counters Defendants' objection with the facts that O'Boyle viewed Henderson favorably until the Crossroads incident, that she was present at the meeting immediately following the incident, and that she made a comment suggesting that Crossroads clients enjoyed cleaning. For the reasons noted above, this evidence, though minimal, sufficiently meets Henderson's burden at the summary judgment stage. Until such facts are tried, it is impossible to determine who actually can be labelled the decision-maker, and summary judgment cannot, therefore, be granted on this theory.

In sum, sufficient ambiguities and contradictions are presented by the cumulated evidence to present genuine issues of material fact as to whether Henderson's discharge was retaliatory. For that reason, the Third and Fourth Claims will not be dismissed.

### III. *The Disparate Treatment Claims Will Be Dismissed*

■ Henderson fails to make out a prima facie case for disparate treatment. Though Henderson's views on race and his actions based on what he perceived to be racist policies may have motivated his firing, no reasonable finder of fact could find that Henderson's discharge was motivated by his race *per se*. None of the evidence Henderson offers for discriminatory treatment is distinguishable from the evidence

that supports his claim for retaliatory discharge. Summary judgment will, therefore, be granted in favor of Defendants on Henderson's first and second claims.

The first and third elements of a prima facie case of discrimination in firing are not in dispute here. As an African–American, Henderson belongs to a protected class, meeting the first element. As to the third element, Henderson was, as a matter of fact, discharged.

The second element requires a plaintiff at the summary judgment stage to demonstrate that it can be concluded that he was qualified. Defendants contend that the various incidents of irresponsibility, insubordination, and violation of YAP policy demonstrate that Henderson has failed to meet even this minimal burden. Yet, as discussed above in the context of the retaliatory discharge claim, Henderson has presented sufficient evidence to present genuine issues of material fact as to each of his alleged breaches. As a result, for the purposes of this motion, he has made out the second element of the prima facie case.

The fourth element of a prima facie case is that the discharge occurred in circumstances giving rise to an inference of racial discrimination. *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir.1989) (citations omitted). Henderson fails to meet even the modest burden required. *See Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1225 (2d Cir.1994); *Viola v. Philips Medical Sys. of North Am.,* 42 F.3d 712, 716 (2d Cir.1994).

In evaluating this element, it is crucial to distinguish the acts alleged to support Henderson's claim of retaliation from those which he argues underlie his disparate treatment. The first act offered by Henderson to support the disparate treatment claim is that at the meeting among O'Boyle, Bloomfield, and Henderson after the Crossroads incident, O'Boyle stated that Crossroads clients enjoyed cleaning. The second is Bloomfield's suggestion to Henderson during that meeting that the latter's objection to the Crossroads policy existed because of race. The third is Weissman's comment after that meeting that Henderson would be well-served if he were

to comport himself differently in the future. The fourth is the fact that Gregg Wilson ("Wilson"), a YAP case manager, was not disciplined when he engaged in activity similar to one of the acts alleged to have been engaged in by Henderson. Wilson apparently provided erroneous legal advice to a YAP client. As a result, a judge seriously chastised YAP and implied that further, presumably disciplinary, action would be taken. CCA apologized to the judge, emphasizing Wilson's excellent reputation, and kept Wilson in its employ.

These four allegations, if true, could not lead a finder of fact to deem that the fourth element of a prima facie case had been made out. Although the first three facts might, as discussed above, support Henderson's claim that he was discharged in retaliation for his intervention into the Crossroads policy, they suggest no more. Henderson has failed to suggest, and it could not be concluded, that the comments demonstrate racial animus. Of the three comments, O'Boyle's and Weissman's are devoid of racial content. Though Bloomfield allegedly suggested that Henderson's objections arose in part because both Henderson and many Crossroads clients were black, Bloomfield did not supervise Henderson, nor does Henderson allege that Bloomfield had the power to discharge Henderson or to influence the decision to discharge him. In sum, assuming that Henderson's discharge was animated by retaliatory animus, none of the evidence proffered suggests that a white man taking the same actions as Henderson would have been treated differently. Indeed, Henderson himself stated at his deposition that he believed that "all of the problems" that he suffered were "as a result of that meeting with Kathy [O'Boyle] and Ken Bloomfield]." As to Wilson, the record fails to present Wilson's race. If Wilson is African–American, then, by definition, the incident does not support a disparate treatment claim. Even if Wilson is not black, the acts alleged against Henderson are far more numerous, disruptive, and threatening than Wilson's single incident, and they cannot effectively be compared.

In sum, Henderson's Complaint does not allege, nor is any evidence offered to suggest,

that Henderson was treated differently on account of his race before the Crossroads complaint. Nor does the Complaint allege or the evidence suggest that any disparate treatment after the Crossroads Complaint arose because of any animus besides that which might have arisen in retaliation for the Crossroads incident. The fact pleaded as part of the disparate treatment claim, then, buttress only retaliation claim, and apply regardless of Plaintiff's race.

Because Henderson has failed to present a prima facie case for disparate treatment, Defendants' motion for summary judgment will be granted as to Claims One and Two.

### IV. *The State Law Claim Will Not Be Dismissed*

New York Executive Law § 296 and Title VII are treated identically. *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 4 (2d Cir.1995) (citations omitted); *Song v. Ives Labs., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992) (citations omitted). Thus, a Title VII analysis equally governs Cohen's § 296 claims. Because Henderson's Third and Fourth Claims will not be dismissed, and for the same reasons, Claim Six, the New York state claim, to the extent that it is based on retaliation, will not be dismissed either. To the extent that the New York state claim is based on disparate treatment, it will be dismissed.

### V. *The First Amendment Claim Will Be Dismissed*

To state a claim under the First Amendment or under 42 U.S.C. § 1983, the behavior complained of must be considered an action of the government, and not that of a private actor. *See, e.g., West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254, 101 L.Ed.2d 40 (1988); *Myron v. Consolidated Rail Corp.,* 752 F.2d 50, 54 (2d Cir.1985). The language "under color of" law found in § 1983 "is treated as the same thing as the 'state action' required under" the Constitution. *United States v. Price,* 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 1157 n. 7, 16 L.Ed.2d 267 (1966). Here, because the alleged infringement of rights was not "fairly attributable to the State," *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982), Defendants' motion for summary judgment will be granted as to Claim Five.

CCA is a private, not-for-profit organization whose facilities are located on privately owned property. CCA contracts with various state agencies in exchange for funding. The contracts refer to CCA as the "contractor," and CCA employees are not eligible for city or state benefits. CCA's board of directors is comprised solely of private individuals.

In *Rendell–Baker v. Kohn,* 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court, presented with a similar set of facts, expressly held that government subsidies and regulation do not convert the actions of private entities into state action. There, the defendant was the director of a not-for-profit school located on privately-owned property. The school specialized in dealing with students with special needs. The plaintiff was a vocational counselor at the school, hired under a federal grant. As a condition of the grant, a governmental entity was required to conduct a qualifications check on the person selected by the school; however, the Committee did not interview applicants and had no other involvement in personnel decisions. The school was operated by a board of directors, none of whom was a public official or was chosen by public officials. Most of the students were referred to the school by various state and local agencies. Pursuant to a Massachusetts statute, when such a referral occurred, the referring city's school committee paid for the student's education. Like CCA, the school received funds from several other government agencies; in total, public funding constituted between ninety and ninety-nine percent of the school's operating budget. To be eligible for tuition funding under the state statute, the school had to comply with a variety of regulations, many of which were common to all schools, and few of which imposed specific personnel requirements. As in this case, the contracts referred to the school as a "contractor" and specified that the city employees were not city employees.

Rendell–Baker was fired by Kohn when a dispute arose over the role of a student-staff council in making hiring decisions. The remaining five plaintiffs, teachers at the school, were discharged after lobbying for Kohn's dismissal. All six filed suit under § 1983, alleging violations of their First, Fifth, and Fourteenth Amendment rights. Finding an absence of the requisite state action, the Supreme Court affirmed the dismissal of these claims by the Court of Appeals for the First Circuit. The Supreme Court held that " 'a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.' " *Id.* at 840, 102 S.Ct. at 2771 (citations omitted).

The Court considered the factors that determine whether or not a private party's action can be considered "state action." First, the Court considered the argument that the school depended on the State for at least ninety percent of its budget. However, the Court concluded that "the school's receipt of public funds does not make the discharge decisions the acts of the State." *Id.* The Court explained that the school was like any other private party that performs government contracts and stated that "[a]cts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Id.* The fact that CCA receives public funding, then, fails alone to impute state action to its decision to terminate Henderson's employment.

*Kohn* next analyzed the impact of extensive regulation by the state. The Court held that government regulation, even if "extensive and detailed," does not make a private party's actions state action. *Id.* The Court noted that "the decisions to discharge the petitioners were not compelled or even influenced by any state regulation. Indeed, in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters." *Id.* The same is true for CCA. Even though CCA's program is regulated in some respects, its personnel decisions are unregulated by the state. The Supreme Court has consistently required a sufficiently close nexus between the state and the challenged action, so that constitutional standards are invoked only when it can be said that the state is "*responsible* for the specific conduct of which the plaintiff complaints." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982) (emphasis in original); *see United States v. International Bhd. of Teamsters,* 941 F.2d 1292 (2d Cir.1991).

In *United States v. International Brotherhood of Teamsters, id.,* the plaintiffs argued that the Independent Administrator ("IA"), in levying sanctions against them, was a "state actor", because the IA had been appointed by the court. In rejecting this argument and, thus, the § 1983 action, the Court of Appeals explained:

> This argument misses the point. The question is not whether the decision to *establish* the IA was state action, but rather whether the IA's decision to *sanction* [the plaintiffs] may be 'fairly attributable' to the Government. Because the IA's decision to sanction [the plaintiffs] was guided only by the IBT Constitution, and not by the state or federal authority, [the plaintiffs'] characterization of the IA's decision as state action must fail.

*Id.* at 1296 (emphasis in original). As in the *Teamsters* case, although some government regulation may be involved in the establishment of ATI programs generally and in limited aspects of CCA's operation, the decision to terminate Henderson's employment was a wholly internal affair, guided by internal CCA personnel policy and practice.

Finally, the *Kohn* Court examined whether the school performed a "public function". The Court explained that a private group can be considered a state actor only if the function it is performing has traditionally been "the *exclusive* prerogative of the State." *Id.* 457 U.S. at 842, 102 S.Ct. at 2772 (citation omitted) (emphasis in original). Since education is not within the exclusive province of the State, the Court held that this factor did not make the school's acts state action. Our Court of Appeals has supplemented the definition of public function as "power ... tradi-

tionally exclusively reserved to the state." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974), by requiring that the function "would have to be performed by the Government but for the activities of the private parties." *Perez v. Sugarman,* 499 F.2d 761, 765 (2d Cir.1974).

In the case at bar, not only is CCA's function in advocating for the release of juvenile offenders from Spofford outside the exclusive province of the state, it is contrary to the public function of incarcerating and detaining such offenders. YAP assists juvenile offenders who, without the program, would simply remain in detention. The Project targets individuals who, after evaluation, are considered to be especially deserving of this opportunity, as they appear to be candidates for successful intervention if given with the support, guidance and close monitoring of YAP. This opportunity would not be offered to them by the state; if CCA did not extend such an opportunity, the children would remain in detention. As the Supreme Court has held, "privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated," do not become state actors. *Blum,* 457 U.S. at 1011, 102 S.Ct. at 2789.

Moreover, even when CCA secures the release of a client from Spofford, there is always a probation officer supervising that client. Were CCA performing the government's job, there would be no need for the State to assign a probation officer. Thus, the placement of a probation officer is an additional indication that CCA is neither substituted for nor acting as a "surrogate for the State." *Jackson v. Statler Foundation,* 496 F.2d 623, 629 (2d Cir.1974).

Henderson cites statutory language concerning alternatives to incarceration program to argue that CCA performs a public function, in that incarceration has historically been the exclusive provenance of the state. He notes that the New York Constitution places authority for the supervision of persons convicted of a crime in the State Legislature, *see* N.Y. Const. Art. 3 § 24, and that the Commissioner of Corrections can release a parole-eligible inmate from incarceration so

that he may "engage in any activity reasonably related to his rehabilitation and in accordance with a program established for him." N.Y.Corr.Law § 73(1) (McKinney 1987). The statute however, makes clear that even while supervised by YAP, YAP is merely supplementing, not serving a public function, for, as the statute mandates, "[w]hile outside the facility [probationers] shall be at all times in the custody of the department of correction and under the supervision of the state division of parole." *Id.* Similar provisions establish the ultimate and ongoing responsibility of the Commissioner of the Division for Youth for non-parole-eligible inmates released for rehabilitative or other purposes. *See id.* at §§ 72–75. Moreover, "[t]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State." *Metropolitan Edison,* 419 U.S. at 350, 95 S.Ct. at 453. The fact that New York law has indicated that alternatives to incarceration serve the public interest does not convert it into a public function. CCA assists, but does not replace, the state in the fulfillment of its incarcerative and rehabilitative responsibilities.

In sum, CCA is not a state actor for the purposes of § 1983 and application of the First Amendment. Claim Five will, therefore, be dismissed.

### Conclusion

Any objection urged by a party on which the Court has not commented has been considered by the Court and rejected summarily as irrelevant or meritless.

For the reasons discussed above, Defendants' motion for summary judgment is granted as to Claims One, Two, and Five, and to Claim Six insofar as it is based on disparate treatment. The motion is denied as to Claims Three and Four, and to Claim Six insofar as it is based on retaliatory discharge.

It is so ordered.